THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* SAM WASHINGTON, Plaintiff in Error.

*Opinion filed December 23, 1926.*

CRIMINAL LAW—*punishment fixed "at" death is sufficiently definite.* While the word "at" often means "near," "in proximity to" or "in the vicinity of," when used in speaking of relations it means "in a state or condition of," and when punishment for murder is fixed "at" death it is sufficiently definite and certain.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. HARRY B. MILLER, Judge, presiding.

CLANTON, CLANTON & JONES, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and MERRILL F. WEHMHOFF, (EDWARD E. WILSON, CLARENCE E. NELSON, and HAROLD LEVY, of counsel,) for the People.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

Plaintiff in error, Sam Washington, was convicted in the criminal court of Cook county of the murder of Minnie Moore and his punishment fixed at death. This court has granted leave to prosecute this writ of error to review the record.

The crime was committed July 1, 1925, at 4114 Calumet avenue, Chicago, in the flat occupied by Walter Davis

and deceased, who were living there in an open state of adultery. From August, 1924, until June 26, 1925, Minnie Moore lived illicitly with plaintiff in error. He was employed by the Pullman Company as a cook, and when he returned from his run June 27 he found vacant the flat which had been occupied by him. He made inquiry among the neighbors but could not learn the whereabouts of Minnie Moore. Finally he ascertained the name of the express-man who had moved the furniture and effects from his flat and found that they had been moved to 4114 Calumet avenue. Sunday morning, June 28, plaintiff in error went to this address about seven o'clock but was refused admittance. Later in the day he called again and was met at the door by Walter Davis, who searched the person of plaintiff in error for a weapon before permitting him to enter the house. Plaintiff in error told him he had come for his clothing, personal effects and some insurance papers. He was invited into the dining room and there told Minnie Moore the object of his visit. She said that the articles belonging to him had not yet been unpacked and that he should come for them the next day. The next morning plaintiff in error met Davis and Minnie Moore on the street, and she told him she was then on her way to work but would be at home Wednesday, July 1, and that he should come for his property then. Wednesday morning he went to 4114 Calumet avenue and found Minnie Moore working in the back yard with her fourteen-year-old son, Bennie Simmons. She invited plaintiff in error to come into the house and they went into the kitchen together. Her son went through the kitchen ahead of them and on to his room. Up to this point there is substantially no conflict in the evidence.

Plaintiff in error testifies that when they entered the house Minnie Moore asked him to wait in the dining room while she went to the front of the house to get his property; that in about two minutes she returned and told him she intended to keep what she had and that she would not give

him anything; that she assaulted him with a 22-caliber automatic pistol but that he was close enough to her to get hold of the pistol before she could fire; that a struggle ensued and the pistol was discharged; that as soon as the shot had been fired he ran from the room and left the flat by the rear door. He testified further that he had never had any trouble with Minnie Moore; that he had never threatened to injure her, and that he did not intend to shoot her when he engaged in the struggle with her but intended only to take the pistol from her to prevent her from shooting him.

Bennie Simmons testified that when he went into his room his mother and plaintiff in error were standing in the dining room; that he heard his mother tell plaintiff in error that she would get his papers; that an instant later he heard five shots fired and heard his mother fall in the hallway, just outside his door; that she barely had had time to walk from plaintiff in error to the point where she fell during the time intervening between her request that he wait and the firing of the shots; that there was no struggle and that nothing was said after his mother told plaintiff in error to wait. Bennie had never seen an automatic pistol or revolver in his mother's house and did not find one in the house after his mother had been shot.

Robert Milton, who occupied a room in the front of the house, heard the gunshots and rushed into the hall. He saw Minnie Moore lying on the floor, screaming. She was near the door of the room occupied by her son. He had heard no disturbance in the house before he heard the shots. He started out of the house to call the police but found that someone else had already done so. The police officers who responded to the call testified that they found the deceased lying on the floor with gunshot wounds in her right side and in her right arm. There were no powder burns on her flesh or clothing. She was removed to the hospital, and

when she was advised by her physician and her minister that she could not live, she made this statement:

*"July 1st, 1925.*

"I, Minnie Davis, believing that I am about to die and having absolutely no hope of recovery, hereby solemnly declare that Sam Washington did on or about the 1st day of July, 1925, in the city of Chicago, county of Cook and State of Illinois,—he came in the house and asked for his insurance papers and things, as I was to be married to-night. As I turned to get his papers he shot me and then ran out of the back door, shooting me three times in the abdomen and once in the arm. I hereby declare the above statement is the whole truth and nothing but the truth, and it is made by me under the fixed belief that I am about to die and look to death as inevitable and at hand."

The statement was written by a police officer and signed by Minnie Moore by her mark.

Edward Neals testified that plaintiff in error came to his home June 28 and inquired whether he had seen Minnie, who was Neal's sister-in-law; that his first call was about one o'clock in the morning and the second shortly after noon; that he told plaintiff in error he did not know where she was; that plaintiff in error was excited and witness invited him to sit down; that he stood up and waved his arm, saying, "If I ever get that woman I will kill her."

Plaintiff in error was arrested in Chicago on July 21, 1925. He had been in Memphis, Tennessee, in the meantime. When he was arrested he told the officers he left Chicago June 28 and returned July 17; that he was in Memphis July 1 and knew nothing about the shooting of Minnie Moore.

The evidence in this record warrants the conclusion that the killing of Minnie Moore was malicious, premeditated and unprovoked. If the other testimony in the record is true then the story told by plaintiff in error is false. If the pistol had been discharged as plaintiff in error says it was, there would have been but one shot and there would have been powder-burns on the clothing and flesh of deceased. Two persons were in the house when the shots

were fired and neither of them heard a struggle. There was nothing in the condition of the clothing of Minnie Moore or the contents of the house which indicated that a struggle had taken place. After the shooting plaintiff in error fled to another State, and when arrested three weeks later he denied any knowledge of the crime. The contention of plaintiff in error that the charge against him is not established beyond a reasonable doubt by the evidence is without merit.

The only point of law mentioned by plaintiff in error which merits discussion is the one raised by his contention that the verdict which fixes his punishment "at death" is so uncertain and indefinite that it does not authorize the court to enter a judgment directing that his life be taken. His contention is that "at" means "near to" or "in proximity to," and that when punishment is fixed *at* death, any punishment provided by law except the actual taking of human life is meant. When one speaks of a point in space, "at" does mean "near," "in proximity to" or "in the vicinity of;" but when one speaks of time, then "at" means "upon the stroke of," and when "at" is used in speaking of relations it means "in a state or condition of." When we say the sun rose at 5:22 A. M. we do not mean that it rose near that time but at exactly that time, and when we say that a nation is at war we do not mean that conditions exist which may lead to war but that a state of war then exists. When punishment is fixed at death the convicted person will be dead when the punishment has been inflicted. The verdict was in proper form.

From the careful examination of this record which the consequences of our decision demand, we are convinced that plaintiff in error has had a fair and impartial trial, and that the jury were fully warranted, under the evidence, in returning the verdict on which the plaintiff in error was sentenced. The judgment of the criminal court is therefore affirmed.

The clerk of this court is directed to enter an order fixing the period between sunrise and sunset of Friday, February 11, 1927, as the time when the original sentence entered in the criminal court of Cook county shall be executed. A certified copy of such order shall be furnished by the clerk of this court to the sheriff of the county of Cook.

*Judgment affirmed.*